UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

---

In re:                                                                     Case Number: 10-10704-13

THEODORE DUANE SLATON
and VICKI LYNN SLATON,

                Debtors.

-----------------------------------------------------------------

KARINA AMUNDSON and
STEVEN LANKFORD,

                Plaintiffs,

v.                                                                          Adversary Number: 10-120

THEODORE DUANE SLATON
and VICKI LYNN SLATON,

                Defendants.

---

## MEMORANDUM DECISION

This is a nondischargeability proceeding. As a general rule, the Court prefers to decide such cases at the close of the trial. However, at the request of counsel, the Court in this case permitted not only the presentation of additional evidence after the original trial date, but the submission of post-trial briefs as well. There was some hope that the parties might come to a mutually agreeable resolution during this additional period of time, but they were unable to do so. The matter is ripe for a decision, which the Court now renders. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and the Court has jurisdiction under 28

U.S.C. § 1334. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

Prior to their bankruptcy, the Slatons owned an auction and collectible business in West Salem, Wisconsin. The plaintiffs are former friends and business partners of the Slatons. The two couples began socializing together after Ted Slaton met Karina Amundson at a rummage sale in May of 2008. Karina and Steven also became involved in the local church where Ted served as a lay preacher. After a time, Ted asked Karina if she was interested in buying into the auction business. The parties discussed the matter further and Karina and Steven ultimately gave the Slatons a total of $145,000.00 to become co-owners of the business.[1] The Slatons acknowledge that they were offering Karina and Steven a 49% interest in a partnership, although no partnership agreement was ever signed.[2]

Unfortunately, the relationship between the two couples soured quickly. The plaintiffs gave the Slatons the money through a series of payments in November

---

[1] Debtors' Exhibit 5 lists a series of five checks in the amounts of $9,000.00, $9,000.00, $12,000.00, $9,000.00, and $106,000.00 dated between November 26, 2008, and December 16, 2008. According to Karina, she got the money by borrowing $100,000.00 from her mother and taking out a second mortgage on her home for $45,000.00.

[2] See Debtors' Exhibits 6, 7, and 8. Exhibit 6 is a standard partnership agreement form with a few handwritten notes. Vicki supposedly made most of the notes, although one entry was allegedly made by Karina. The notes suggest discussions about the name of the partnership, the purpose of the partnership, and that each "group" of partners was contributing $150,000.00 even though the Slatons would receive 51% of the partnership. The last page of the document includes a handwritten observation about dispute resolution/mediation that echos the hope of so many friends turned business associates: "We will solve any problems between ourselves." Although the parties clearly contemplated forming a partnership, the agreement itself was never executed.

and December of 2008. They testified that by June of 2009, Ted had become too difficult to work with, at which point they demanded the return of their investment. The money, however, had already been spent. Ted testified that he used the money to pay off business debt, most notably the mortgage on the business building. He testified that he had discussed this plan with Karina and Steven during their initial negotiations. He also recognized the existence of a partnership in which he and Vicki were the controlling partners and admitted that they were responsible for the financial management of the business. Between the parties, he and Vicki were the more sophisticated in terms of business experience. Karina's work experience included time as a hairstylist and a stint as the personal assistant to pianist George Winston, while Steven has a background in construction and is currently a photographer.

Karina and Steven contend that they should receive at least 49% of the net proceeds from the sale of all partnership assets, including the sale of the building itself. They also believe that they have a claim for unjust enrichment against the Slatons, and that their claims are nondischargeable under the following sections of the bankruptcy code: 11 U.S.C. § 523(a)(2)(A) as a debt for money obtained through false pretenses, a false representation, or actual fraud; 11 U.S.C. § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity; and 11 U.S.C. § 523(a)(6) for willful and malicious injury. The Slatons acknowledge that they have some liability to the plaintiffs but deny that the debt is nondischargeable. They also contend that the plaintiffs knew of the plan to eliminate the mortgage debt and that they have accurately accounted for all sales of business assets.

This case first came on for trial on May 24, 2011. After the conclusion of the day's testimony, the Court determined that it was appropriate for the debtors to supply the plaintiffs with an accounting as to the disposition of certain assets. The trial was continued pending the presentation of that accounting.[3] The matter came back before the Court on August 30, 2011. At that time, the plaintiffs renewed their request to submit post-trial briefs. The debtors did not oppose this request. A briefing schedule was established, and a telephonic hearing was subsequently held on the briefs on March 7, 2012.

The Court will first consider the plaintiffs' nondischargeability claims. Bankruptcy relief is designed for the "honest but unfortunate debtor," and Congress crafted the exceptions to discharge with that limitation in mind. Brown v. Felsen, 442 U.S. 127, 128, 99 S. Ct. 2205, 60 L. Ed. 2d 767 (1979); DeAngelis v. Von Kiel (In re Von Kiel), 461 B.R. 323, 332 (Bankr. E.D. Pa. 2012). Nonetheless, in keeping with the bankruptcy code's concept of a "fresh start," exceptions to discharge are to be construed strictly against the creditor and liberally in favor of the debtor. See In re Crosswhite, 148 F.3d 879, 881 (7th Cir. 1998); In re Scarlata, 979 F.2d 521, 524 (7th Cir. 1992). The plaintiff must prove all elements of the

---

[3] The plaintiffs' supplemental exhibit list includes photos of auction inventory which they believe belonged to the partnership but was offered for sale by the Slatons personally. Vicki Slaton filed an affidavit incorporating various profit and loss statements for 2008 and 2009. The basic question is whether the Slatons adequately accounted for a split between the "partnership" inventory and items offered for sale by them personally. After a review of the documents and the testimony of the parties, the Court finds insufficient evidence to conclude that the Slatons misrepresented the inventory or otherwise converted partnership inventory to their personal use.

specified exception to discharge by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287-88, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).

To prevail under § 523(a)(2)(A), the statute generally requires proof of a false representation, omission, or some sort of trickery; an intent to deceive; and justifiable reliance. See McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000). The debtor must have known of the falsity or acted with reckless disregard for the truth. Ojeda v. Goldberg, 599 F.3d 712, 717 (7th Cir. 2010). The most common type of fraud involves a deliberate misrepresentation or a deliberately misleading omission. McClellan, 217 F.3d at 892. However, actual fraud is broadly defined as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." Id. at 893 (citing 4 Collier on Bankruptcy ¶ 523.08[1][e], p. 523-45 (15th ed., Lawrence P. King ed., 2000)).

Although Karina and Steven are justifiably upset by the outcome of their investment in the business, the testimony at trial did not identify any false representations or trickery by the Slatons. There was also no evidence of an intent to deceive. It is possible to prove an intent to deceive through direct evidence. Wrongful intent may also be logically inferred through proof of a false representation which the debtor knows, or should know, will induce another to make a loan (or investment). In re Sheridan, 57 F.3d 627, 633 (7th Cir. 1995). Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive. Vozella v. Basel-Johnson (In re Basel-Johnson), 366 B.R. 831, 845 (Bankr. N.D. Ill. 2007). The debtor's intent to deceive is

measured by the subjective intention manifested at the time the alleged representation was made. CFC Wireforms, Inc. v. Monroe (In re Monroe), 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004). In other words, it doesn't matter that things went wrong later. The Slatons had to be lying from the start, and their lies had to trick Karina and Steven into making their investment.

In this case there is simply not enough evidence that Ted or Vicki lied, tricked, or otherwise deceived the plaintiffs into investing $145,000.00 in the business. There is no evidence that the friendship was feigned, or that Ted lied to them about any particular aspect of the business. Instead, it appears that the invitation to join the business was sincere.[4] The parties intended to form a partnership and the plaintiffs invested $145,000.00 in what was, in hindsight, a rather risky venture. As business advisers routinely note, it is dangerous to go into business with family or friends because the relationships rarely survive if there is a falling out. The business relationship was handled far too informally. For example, they drafted a partnership agreement but never signed it. There was no other written document memorializing their understanding and it should come as no surprise that there is now some level of disagreement over what may have been said. According to Karina, Ted was opposed to having an attorney involved and so

---

[4] The Slatons offered several exhibits to illustrate the depth of the friendship, including a card Karina gave to Vicki (Debtors' Exhibit 15), the program from Steven and Karina's wedding (Debtors' Exhibit 14), and pictures of the two couples celebrating Thanksgiving together in 2008 (Debtors' Exhibit 12). After the formation of the "partnership," it certainly appears that everyone expected the business to go forward. Their business cards referenced the names of all four partners, and the company checking account for "Art & Antiques in West Salem" included the names of Ted, Vicki, and Karina. See Debtors' Exhibit 17.

they negotiated their arrangement without the benefit of legal counsel. However, there is no evidence that he prevented her from consulting with an attorney. While neither she nor Steven are necessarily financially sophisticated investors, they did have some prior business experience. Ted indicated that they had several conversations about the business, including a discussion about using the investment money to eliminate business debt. Neither Karina nor Steven specifically identified any lies or misrepresentations made to induce them to make the investment, other than the generic claim that Ted made a concerted effort to gain their trust (and ultimately their money).

The testimony revealed that the relationship between the parties floundered not because the Slatons fraudulently induced the plaintiffs to invest in the business, but because Karina and Steven found Ted too difficult to work with on a daily basis. Karina testified that after one particularly difficult confrontation, she simply had to leave and never came back. These subsequent disputes illustrate the difficulty of going into business with friends, but they are not substantive evidence that Ted and Vicki obtained the money from the plaintiffs through some sort of lie, trick, or other deceit. Essentially, Ted had to be lying to them all along in order for the debt to be nondischargeable under § 523(a)(2)(A), and the Court cannot find that he had the required intent to deceive them. It simply appears the parties thought they could work together and learned to their sorrow that they could not.

For a claim to be nondischargeable on the grounds that it constitutes "fraud or defalcation while acting in a fiduciary capacity" under § 523(a)(4), it is necessary

for the plaintiffs to show that the debtors acted as fiduciaries to the creditors at the time the debt was created, and that the debt was created by fraud or defalcation. Follett Higher Educ. Group, Inc. v. Berman (In re Berman), 629 F.3d 761, 765-66 (7th Cir. 2011). The determination of fiduciary capacity for purposes of the bankruptcy code is a question of federal law. O'Shea v. Frain (In re Frain), 230 F.3d 1014, 1017 (7th Cir. 2000). The scope of a fiduciary relationship under § 523(a)(4) is not as broad as the traditional state law concept, and not everyone that state law defines as a fiduciary is necessarily held to act in a "fiduciary capacity" for bankruptcy purposes. Berman, 629 F.3d at 767.

      The plaintiffs suggest that the parties operated a sort of joint venture, and that the Slatons had fiduciary responsibilities as the majority stakeholders in the venture. In the Seventh Circuit, the "subset" of fiduciary relationships that fall within the meaning of § 523(a)(4) are those in which there is a "substantial inequality in power or knowledge in favor of the debtor." In re Woldman, 92 F.3d 546, 547 (7th Cir. 1996) (citing In re Marchiando, 13 F.3d 1111, 1116 (7th Cir. 1994)). In Frain, the debtor was the majority shareholder in a corporation and also responsible for the day-to-day business decisions of the company. The court noted that although this gave him a "natural advantage" over the other shareholders, such an advantage did not itself place him in the type of "position of ascendency" over the others required under § 523(a)(4). Instead, a fiduciary relationship was created because the concentration of power was so "one-sided." 230 F.3d at 1018. Specifically, the debtor in Frain had virtually absolute control over the company, and no major decisions could be made without his consent. The court observed:

8

> A Chief Operating Officer with 50% of the shares who cannot be removed for cause without his consent possesses a position of considerable ascendancy over the other shareholders. All of the decisions made in the ordinary course of business were [the debtor's] to make. All of the major decisions required [the debtor's] agreement. If [the debtor] abused this power, termination for cause was a tantalizing, but unavailable fiction. This shareholder's agreement was not a system of checks and balances. [The debtor] had more knowledge, and substantially more power, than appellants.

Id.

While the Slatons may have had more experience in the auction business than the plaintiffs and may have been responsible for the financial management of the business, the Court cannot find that there was the type of fiduciary relationship contemplated by the bankruptcy code. It is true that partners owe one another fiduciary duties. But this is not a situation in which "one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals." Marchiando, 13 F.3d at 1116. Karina and Steven opted to join Ted and Vicki in the auction business and they were able to monitor the operation until they decided that working with Ted was unbearable. For purposes of the statute, the fiduciary responsibility needs to arise prior to the alleged wrong. Berman, 629 F.3d at 767-68. Ted and Vicki may have breached their agreement with the plaintiffs and may have failed to return their investment, but at the outset of their relationship the parties were far closer to joint venturers or equals than anything else. As such, the debt cannot be excepted from discharge under this section of the code.

Finally, to prevail under § 523(a)(6), the plaintiffs must show that the Slatons caused an injury and acted both willfully and maliciously in doing so. Shriners

Hosp. for Children v. Bauman (In re Bauman), 461 B.R. 34, 49 (Bankr. N.D. Ill. 2011). Injuries that are recklessly or negligently inflicted do not fall within the scope of the statute. Id. Basically, the facts must demonstrate that the Slatons deliberately intended the harmful consequences of their actions in order for it to be "willful." Id. An act is "malicious" if it is done in "conscious disregard" of one's duties or without just cause or excuse." In re Thirtyacre, 36 F.3d 697, 700 (7th Cir. 1994); Zamora v. Jacobs (In re Jacobs), 448 B.R. 453 (Bankr. N.D. Ill. 2011).

     A review of the facts indicates that the Slatons used the plaintiffs' money primarily to pay down business debt. Ted Slaton testified that he discussed this plan with the plaintiffs prior to their investment. At the time that the plaintiffs demanded the return of their money, there was no way for the Slatons to produce the full amount, although Ted testified that he had been willing to sell the building and divide the proceeds. The plaintiffs do not dispute the fact that the Slatons did, at various times, offer to sell the building. Put simply, the testimony indicates that Ted believed that there was an agreement as to the use of the funds. He certainly intended to use the invested funds to pay down the business debt, but there is no evidence that he intended the resulting harm (i.e., the loss of the plaintiffs' money). Given that he subjectively believed that the partners were in agreement as to the use of the funds, the Court cannot find that he acted in conscious disregard of his duties or that he acted without excuse. Although Ted clearly failed to repay the plaintiffs when the partnership failed, his conduct was neither "willful" nor "malicious" within the meaning of the bankruptcy code.

Having addressed issues of nondischargeability, there remains the question of unjust enrichment. Under Wisconsin law, a claim for unjust enrichment requires proof of three things: the plaintiff must have conferred a benefit upon the defendant, the defendant must have understood the value or significance of the benefit, and the benefit must have been accepted and retained by the defendant under circumstances which indicate that it would be inequitable to retain the benefit without payment. Staver v. Milwaukee County, 2006 WI App 33, 289 Wis. 2d 675, 712 N.W.2d 387. As the Wisconsin Supreme Court has indicated, the doctrine is founded "upon the premise that the obligation to make restitution arises not from any representation or promise, but rather upon the circumstances which create a duty to make restitution." Lawlis v. Thompson, 137 Wis. 2d 490, 405 N.W.2d 317, 319 (Wis. 1987). The existence of a formal agreement "is a concept entirely foreign to the quasi-contract concept of unjust enrichment and restitution." Id. at 320. Instead, unjust enrichment is an obligation created by law and equity in the absence of an agreement "when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not retain it." Grossbier v. Chicago, St. P., M. & O. Ry. Co., 173 Wis. 503, 508, 181 N.W. 746 (1921) (citing Miller v. Schloss, 218 N.Y. 400, 407, 113 N.E. 337 (1916)).

Clearly, the Slatons received a benefit from the plaintiffs, and there is no doubt that the Slatons understood the value of what they received. They also knew from the outset that they planned to use the plaintiffs' investment to pay off business debt, most notably the mortgage on the building. Under the facts of this

11

case, it would be inequitable for them to retain that money, or the resulting benefit, without repayment. They paid the mortgage debt with the funds given to them by the plaintiffs, and they have now sold the building and realized a benefit which was only possible because of that money. As the plaintiffs noted in their reply brief, the Slatons now propose to use the proceeds of the sale of the building to pay a variety of claims through their chapter 13 plan. But if Karina and Steven had not given the Slatons $145,000.00 in the fall of 2008, those proceeds would not exist. It is patently inequitable for the Slatons to use the benefit they received from the plaintiffs to fund the repayment of their personal liabilities in this case. As such, the plaintiffs have proven their claim for unjust enrichment and they are entitled to the net proceeds of the sale of the building.

  A judgment shall be entered consistent with this decision.

  Dated: April 6, 2012

                BY THE COURT:

                /s/ Thomas S. Utschig

                _____
                Hon. Thomas S. Utschig
                U.S. Bankruptcy Judge